IN RE INTEREST OF CRYSTAL T., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, DEPARTMENT OF SOCIAL SERVICES, APPELLANT, V. KEVIN T. AND LETTA T., APPELLEES.
546 N.W.2d 77

Filed April 16, 1996.   No. A-95-717.

Don Stenberg, Attorney General, Royce N. Harper, and Beth Tallon, Special Assistant Attorney General, for appellant.

Brian C. Bennett, of Bennett Law Office, P.C., for appellees.

MILLER–LERMAN, Chief Judge, and IRWIN and MUES, Judges.

MUES, Judge.

## INTRODUCTION

The Nebraska Department of Social Services (DSS) appeals from an order of the county court for Seward County, sitting as

a juvenile court, denying the State's motion for parental contribution in a juvenile proceeding wherein Crystal T. was adjudicated a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(b) (Reissue 1993). Crystal's adoptive parents, Kevin T. and Letta T., resisted parental contribution based upon a subsidized adoption agreement with DSS.

## BACKGROUND

Crystal was born August 2, 1980. In the spring of 1986, Crystal, then 5, became a foster child to Kevin and Letta. Upon Crystal's initial placement, Kevin and Letta were advised of behavioral problems anticipated with Crystal as a result of various experiences and conditions to which she had been exposed.

Before placement with Kevin and Letta, Crystal had undergone multiple placements. Formalized professional counseling had been recommended, and DSS was aware that the need for counseling Crystal in the future was predictable based upon the chaotic background of several placements, the death of a foster sister, and the lack of contact with her biological mother.

In January 1987, Kevin and Letta applied for participation in a subsidized adoption program with DSS. At that time, DSS recognized the possibility that Crystal had suffered psychological damage in her early years because of disruptions in relationships and the "very real possibility" that Crystal had been a victim of sexual abuse and fetal alcohol syndrome. In the paperwork accompanying the original subsidized adoption program documents, a DSS worker stated that anyone familiar with the effects of sexual abuse, multiple disruptive placements, and fetal alcohol syndrome was aware that many of the victims developed serious behavioral problems during their teenage years, including being a runaway, "continued victimization, becoming a sexual abuse perpetrator, [and] drug and alcohol abuse." Because of this, the initial adoption agreement provided not only for a monthly subsidy to Kevin and Letta, along with medical coverage, but also specifically for coverage of mental health costs incurred due to the possibility of "sexual abuse, incest, prenatal alcohol abuse, and possible drug abuse by

Crystal's mother." The agreement provided that such mental health coverage may include, but not be limited to, family counseling, group therapy, inpatient and outpatient care, and medications.

In the summer of 1987, Kevin and Letta adopted Crystal. Thereafter, subsidized adoption agreements were annually renewed with the last such agreement dated May 1994. The agreement continued the monthly maintenance assistance to Kevin and Letta in the amount $209, medicaid payments until Crystal was 19 years of age, and in language nearly identical to the first subsidized adoption agreement, payment for medical/mental health treatment for Crystal for those "pre-existing conditions" identified in the initial agreement, with the type of treatment for such "conditions" again stated to include "but . . . not limited to family counseling, group therapy, in patient & outpatient care and medications."

At some point prior to November 3, 1994, Crystal was placed at the Lincoln Regional Center under a mental health warrant. On November 3, the Seward County Attorney filed a petition in the Seward County Court, sitting as a juvenile court. The petition generally alleged that Crystal was a juvenile as described in § 43–247(3)(b) in that she was a child who, by reason of being wayward or habitually disobedient, was uncontrolled by her parents, deported herself so as to injure or endanger seriously the morals or health of herself or others, or was habitually truant from school or home. On November 14, Crystal was adjudicated under § 43–247(3)(b), and a dispositional hearing was set for December 13. The record before us does not contain the proceedings of the adjudication hearing, the dispositional hearing, or the dispositional order of the juvenile court.

On April 24, 1995, a hearing was held in the juvenile proceeding on the State's motion for an order of parental contribution. The State's motion is also not in the record. The sole evidence offered by the State in support of its motion consisted of an affidavit of a DSS child support caseworker; the most recent subsidized adoption agreement of May 1994; a basic net income and support calculation worksheet 1 from the Nebraska Child Support Guidelines, with supporting financial

and income data of Kevin and Letta; and a letter to DSS from Kevin. The affidavit reflects that Crystal, as of February 24, 1995, was in the

> care and custody of the Nebraska Department of Social Services and has been placed in/at <u>Grace's Children's Home</u> since <u>December</u> <u>16</u>, 19<u>94</u>. The Nebraska Department of Social Services has to pay $<u>1833.82</u> per month for the care of <u>Crystal</u> at the above placement, plus medical expenses not covered by insurance.

The affidavit further states that the present plan was for Crystal to remain at this placement. The State's child support calculations asserted that under the guidelines, Kevin and Letta were obligated to pay a total of $425 per month toward the support of Crystal.

Kevin and Letta objected to the relevance of the State's evidence, generally arguing that DSS had a contractual obligation to provide for Crystal's care at Grace's Children's Home by virtue of the subsidized adoption agreement. Subject to that objection, they offered various financial records of Kevin and Letta along with the original January 1987 subsidized adoption agreement and accompanying memorandum from DSS evidencing DSS' recognition, at that time, of the likelihood of Crystal's future behavioral problems as set forth above. Kevin testified that at the time of the original agreement, he and Letta were concerned that when Crystal became a teenager, her behavior may become so disruptive that she could not stay in their home. He testified this was the entire point of the adoption subsidy, as they could not afford the psychiatric care which might become necessary. Kevin testified without objection that he had made it known to the State, at the time of the original agreement, of his inability to provide for the costs of Crystal's placements which might be needed based upon these preexisting conditions and that in his opinion, DSS had agreed to bear that cost. It was Kevin's understanding that DSS and the State would take care of all of the psychiatric care Crystal needed, including inpatient therapy. Kevin testified that the monthly subsidy amount was suspended immediately upon Crystal becoming a "ward of the state" and that he was not objecting to the suspension of that subsidy.

On June 14, 1995, the juvenile court entered an order denying the State's request for parental contribution. In so doing, the juvenile court judge reasoned that DSS had persuaded the adoption by entering into the subsidized adoption agreements and, in those agreements, had promised to pay for Crystal's extreme needs as were anticipated by DSS. The court concluded that DSS had agreed to pay far more than just medicaid coverage for those specialized needs that it believed would develop and that now that they had developed, DSS should honor its agreement. The court concluded:

> It has become necessary to make the juvenile a state ward, due to those same anticipated problems. . . .
>
> . . . .
>
> . . . I refuse to order these parents to pay any parental contribution to the cost of this juvenile's out of the home care and treatment without any regard to ability to pay. I refuse to make any findings relating to ability to pay.

DSS timely appeals from this order.

## ASSIGNMENT OF ERROR

The sole assignment of error of DSS is that the juvenile court erred in not assessing any parental financial responsibility.

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach conclusions independent of the trial court's findings. However, where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994); *In re Interest of J.A.*, 244 Neb. 919, 510 N.W.2d 68 (1994); *In re Interest of Tamika S. et al.*, 3 Neb. App. 624, 529 N.W.2d 147 (1995).

■ The determination of the amount of child support is initially entrusted to the discretion of the trial court, and although on appeal the issue is tried de novo on the record, in the absence of an abuse of discretion, the trial court's award of child support will be affirmed. *Shiers v. Shiers*, 240 Neb. 856,

485 N.W.2d 574 (1992); *In re Interest of Tamika S. et al.,
supra.*

## PREFACE

Neb. Rev. Stat. § 43–290 (Reissue 1993) provides that
pursuant to a petition filed in accordance with Neb. Rev. Stat.
§ 43–274 (Reissue 1993), whenever the care or custody of a
juvenile is given by the court to someone other than his or her
parents, or when the juvenile is given medical, psychological,
or psychiatric study or treatment under order of the court, the
court shall make a determination of support to be paid by the
parent for the juvenile. Section 43–290 provides that the court

> may order and decree that the parent shall pay, in such
> manner as the court may direct, a reasonable sum that will
> cover in whole or part the support, study, and treatment of
> the juvenile, which amount ordered paid shall be the extent
> of the liability of the parent. The court in making such
> order shall give due regard to the cost of study, treatment,
> and maintenance of the juvenile, the ability of the parent
> to pay, and the availability of money for the support of the
> juvenile from previous judicial decrees, social security
> benefits, veterans benefits, or other sources.

Section 43–290 also provides that when medical,
psychological, or psychiatric study or treatment is ordered by
the court, or if such study or treatment is otherwise provided as
determined necessary by the custodian of the juvenile, the court
shall inquire as to the availability of insured or uninsured health
care coverage or service plans which include the juvenile. This
section further instructs that if the juvenile has been committed
to the care and custody of DSS, DSS shall pay the costs for the
support, study, or treatment of the juvenile which are not
otherwise paid by the juvenile's parent.

Crystal was adjudicated under § 43–247(3)(b) and pursuant
to Neb. Rev. Stat. § 43–284 (Reissue 1993), the court was
empowered to commit the juvenile to the care and custody of
DSS. While we do not have the dispositional order of the
juvenile court before us, we presume that since the dispositional
hearing was scheduled to be held December 13, 1994, and since
DSS has had care and custody of Crystal since that date, the

threshold requirement of § 43–290 that the care or custody of the juvenile has been given to "someone other than his or her parent" has been met.

We digress briefly to discuss basic requirements of § 43–290. Section 43–290 expressly states that its provisions are triggered when a petition is filed in accordance with § 43–274. Section 43–274 generally addresses the institution of proceedings under the Nebraska Juvenile Code. It expressly provides for the filing of a petition in writing specifying which subdivision of § 43–247 is alleged, and also "requesting the court to determine whether support will be ordered pursuant to section 43–290."

Neb. Rev. Stat. § 43–279(1) (Reissue 1993) speaks, inter alia, to various matters which the juvenile court shall inform the parties of when a petition alleges a juvenile to be within the provisions of § 43–247(3)(b). One such matter that the court must inform the parties of is the "nature of the proceedings and the possible consequences or dispositions pursuant to sections 43–284 to 43–287, 43–289, and *43–290* that may apply to the juvenile's case following an adjudication of jurisdiction." (Emphasis supplied.) § 43–279(1)(a).

The State's initiating petition in this case contains no allegation requesting a determination of whether support will be ordered pursuant to § 43–290. The record selected by DSS for appeal contains no showing that Kevin and Letta were given the advisements required under § 43–279(1), other than the "form" order dated November 14, 1994, which recites that at the hearing then held, the court informed the parties of "THE NATURE OF THE PROCEEDINGS AND THE RANGE OF POSSIBLE DISPOSITIONS." Evidence offered at the hearing on the State's motion for support causes us to question when Kevin and Letta were first informed of this potential. Specifically, in a February 14, 1995, letter from Kevin to DSS generally voicing his objection to the payment of child support, he states that at the court hearing which "made Crystal a state ward," DSS "started pressing the judge for a court date to set child support," and that the caseworker "immediately started badgering us about it being our financial responsibility because the subsidy agreement is void with Crystal being a state ward." Kevin went on to state: "At no time prior to the placement

hearing was child support mentioned." We presume that the "placement hearing" referred to by Kevin was the dispositional hearing. Kevin was not examined at the hearing with regard to these statements, and they are uncontested in the record presented to us on appeal, except for the juvenile court's November 14, 1995, order.

A failure of the State to give timely notice to the parties of the potential for parental contribution, and a failure of the juvenile court to comply with § 43-279(1) in this regard, carries due process implications potentially disruptive of the adjudication process. See, e.g., *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992); *In re Interest of A.D.S. and A.D.S.*, 2 Neb. App. 469, 511 N.W.2d 208 (1994). However, because Kevin and Letta did not object to the procedure below on these grounds, because the record below on the proceedings at which they were supposedly advised of their rights under § 43-279(1) is not included in the bill of exceptions on this appeal, and because of our resolution of this appeal, we do not decide, in this case, the effect of the failure of the record on appeal to affirmatively show compliance with these provisions of the juvenile code.

## DISCUSSION

DSS argues that the juvenile court erroneously refused to apply the child support guidelines as promulgated by the Nebraska Supreme Court pursuant to Neb. Rev. Stat. § 42-364.16 (Cum. Supp. 1994), as evidenced by its refusal to make any findings on the ability of Kevin and Letta to pay child support. DSS contends that pursuant to our decision in *In re Interest of Tamika S. et al.*, 3 Neb. App. 624, 529 N.W.2d 147 (1995), and Neb. Rev. Stat. § 43-2,113(3) (Cum. Supp. 1994), the guidelines should have been applied and that the evidence in this case does not justify any deviation from a strict application of those guidelines. Kevin and Letta contend that, if applicable, the circumstances of this case, including the existence of the subsidized adoption agreement, justify a deviation from the guidelines. Kevin and Letta further argue that the provisions of § 43-290 allow a juvenile court to consider the availability of money for the support of a juvenile from other sources in its

determination of whether to order parental contribution and that the obligation of DSS under the agreement was properly viewed by the juvenile court in this case as such available source of money, thus justifying denial of any child support from them.

In *In re Interest of Tamika S. et al., supra,* a proceeding pursuant to § 43-290, we held that the guidelines apply in juvenile cases where child support is ordered. Section 43-2,113(3) provides further support for that conclusion, as it provides that all orders issued by a separate juvenile court or a county court which provide for child support shall be governed by Neb. Rev. Stat. §§ 42-347 to 42-379 (Reissue 1993, Cum. Supp. 1994 & Supp. 1995) and § 43-290. *In re Interest of Tamika S. et al.* did not hold that in proceedings under § 43-290, the guidelines applied in determining *whether* support should be ordered.

■ Section 43-2,113(3) also specifies that juvenile or county court orders providing for child support shall be governed by § 43-290. Section 43-290 provides that the court *may* order parents to pay a reasonable sum to cover, in whole or in part, the support, study, and treatment of the juvenile and that in making such order, the court *shall* "give due regard to the cost of study, treatment, and maintenance of the juvenile, the ability of the parent to pay, and the availability of money for the support of the juvenile from . . . other sources." When the word "may" appears in a statute, permissive or discretionary action is presumed. Neb. Rev. Stat. § 49-802(1) (Reissue 1993). See *Eberspacher v. Hulme,* 248 Neb. 202, 533 N.W.2d 103 (1995). Thus, whether the parents are ordered to contribute to the support, study, and treatment of a juvenile who has been placed by the county court with someone other than his or her parent is initially a matter entrusted to the discretion of the juvenile or county court under § 43-290. In making such an order, such juvenile or county court shall give due regard to the aforementioned factors.

■ *In re Interest of Tamika S. et al.* holds only that *where* child support is ordered, the guidelines apply. This court has not addressed the issue of whether the guidelines apply to the determination under § 43-290 of *whether* an order of parental contribution should be made. We find no Nebraska Supreme

Court case specifically addressing that issue. When the guidelines are applicable, child support payments should be set according to such guidelines. *Dike v. Dike*, 245 Neb. 231, 512 N.W.2d 363 (1994); *Knippelmier v. Knippelmier*, 238 Neb. 428, 470 N.W.2d 798 (1991). The guidelines shall be applied as a rebuttable presumption, and all orders for child support shall be established in accordance with the guidelines, unless rebutted. § 42-364.16; Nebraska Child Support Guidelines, paragraph C. When a party produces sufficient evidence to prove that application of the guidelines would result in an unfair and inequitable child support order, the court may and should deviate from the guidelines. *Shiers v. Shiers*, 240 Neb. 856, 485 N.W.2d 574 (1992); *In re Interest of Tamika S. et al., supra*; *Dworak v. Fugit*, 1 Neb. App. 332, 495 N.W.2d 47 (1992).

Paragraph C of the guidelines sets forth certain circumstances under which deviations from the guidelines are permissible. Such circumstances include "for juveniles placed in foster care," "whenever the application of the guidelines in an individual case would be unjust or inappropriate," and "when there are extraordinary medical costs of [the] child." It would appear that the factors mentioned in § 43-290 are encompassed in substance, at least in part, by the foregoing grounds for deviation recognized in paragraph C of the guidelines. In any event, we conclude that the guidelines and the specific factors enunciated in § 43-290 must be considered together in a juvenile court's determination under § 43-290 of whether parental support should be ordered and, if so, the extent of such support.

By applying the guidelines and the factors recognized in § 43-290, our de novo review of the record causes us to conclude that the juvenile court did not abuse its discretion in denying parental support in this case. We reach this conclusion based more on what the record does *not* show than on the evidence presented. A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through the judicial system. *Grady v. Visiting*

*Nurse Assn.*, 246 Neb. 1013, 524 N.W.2d 559 (1994); *Schlake v. Jacobsen*, 246 Neb. 921, 524 N.W.2d 316 (1994).

■ The juvenile court's findings do not specifically refer to the guidelines, any deviation from the guidelines, or to one or more of the factors mentioned in § 43-290 as grounds for its decision not to order any parental support from Kevin or Letta. Yet, it is apparent that the primary factor motivating the judge's decision below was the subsidized adoption agreement and the obligations which the court determined the agreement created on the part of DSS with regard to Crystal's care and treatment. The juvenile court found that the necessity for Crystal becoming a state ward was "due to those same anticipated problems" which DSS believed, at the time of Crystal's initial placement with Kevin and Letta, would eventually manifest themselves. DSS does not contest this finding, and we find no evidence in the record to refute it. Having implicitly concluded that Crystal's placement with DSS and Grace's Children's Home (GCH) was necessitated by the "pre-existing condition(s)" specified in the agreement, the court apparently concluded that the monthly expense incurred at GCH fell within the parameters of the "medical/mental health treatment" for which DSS became obligated under that agreement. We believe a fair implication is that the court concluded that the DSS subsidized adoption agreement was a "source" of money available for the support of Crystal. This was a proper factor for it to consider under § 43-290.

Of course, just because Crystal was placed at GCH due to preexisting conditions recognized in the DSS agreement does not necessarily lead to the conclusion that DSS' obligations under the agreement was for the full expense of Crystal's stay at GCH. Yet, the juvenile court implicitly so found when it denied the motion for parental contribution and expressly stated: "NDSS persuaded these people to agree to the proposed subsidized adoption of this juvenile. NDSS promised to pay for this juvenile's extreme needs, as NDSS anticipated would develop. NDSS can now honor their agreement." Thus, while the agreement obligated DSS to pay only for "medical/mental health treatment" arising out of the specified preexisting

conditions, the court apparently concluded that the entire monthly expense of GCH constituted such "treatment."

While logic suggests that the monthly expenses of Crystal at GCH *might* include things other than what would reasonably be considered medical or mental health treatment, the sparse record will not allow us to reach such a conclusion. The record is devoid of any evidence as to what GCH is, where it is, or what its function is. There is no evidence as to what services are being provided to Crystal for the $1,833.82 monthly charge from GCH to DSS. Since we do not have the juvenile court's dispositional order or the proceedings of the dispositional hearing before us, we do not know whether the juvenile court ordered medical, psychological, or psychiatric study or treatment of Crystal as part of its dispositional order or whether it is otherwise being provided by GCH.

In its brief, DSS occasionally refers to Crystal's placement at a "group home," presumably referring to GCH. Again, while we might speculate that expenses for group home placement include things other than what would normally be categorized as medical or mental health treatment, such as room, board, clothing, personal expenses, etc., we have no evidence that GCH is a group home, a maximum security prison, or just a home in which children live which is run by somebody named "Grace" for a per child monthly charge of $1,833.32. DSS further argues that its regulations prohibit paying for inpatient psychiatric care provided by "foster or group homes or child caring agencies." Brief for appellant at 10. DSS is apparently contending that since its regulations prohibit payment for such services at such places, its subsidized adoption agreement could not reasonably be interpreted to cover all the expenses of Crystal at GCH. Once again, we do not have any evidence that GCH is one of such establishments or that any of the services provided by it for Crystal are for "inpatient psychiatric care." More importantly, no such administrative rule or regulation appears in the record before us. Generally, the appellate courts of this state will not take judicial notice of administrative rules or regulations. It is incumbent upon the party relying on an administrative rule or regulation to prove both its existence and its language. *Sunrise Country Manor v. Neb. Dept. of Soc.*

*Servs.*, 246 Neb. 726, 523 N.W.2d 499 (1994) (citing *Donahoo v. Nebraska Liquor Control Comm.*, 229 Neb. 197, 426 N.W.2d 250 (1988)).

The juvenile court judge who heard the State's motion for parental contribution was the same judge who had presided over the adjudication and the dispositional proceedings. He presumably was privy to substantially more background evidence than was offered at this hearing and, consequently, more than is before us on appeal. However, for evidence to be considered by this court, it must have been offered below and must appear in the record on appeal. Our de novo review is necessarily limited to the evidence before us.

We agree with DSS that the adoption of Crystal does not evaporate merely because juvenile proceedings are instituted.

> After a decree of adoption is entered, the usual relation of parent and child and all the rights, duties and other legal consequences of the natural relation of child and parent shall thereafter exist between such adopted child and the person or persons adopting such child and his, her or their kindred.

Neb. Rev. Stat. § 43–110 (Reissue 1993).

One of the "legal consequences" of the adoption was that Kevin and Letta have the responsibility as Crystal's parents to provide support for her. While the agreement with DSS obligates DSS to provide certain subsidies to Kevin and Letta and to pay for certain medical and mental health treatment, it does not relieve Kevin and Letta of all financial obligations for the support and care of Crystal. Indeed, the agreement expressly provides: "Existence of subsidy does not diminish the adoptive parent's/parents' legal status or responsibility, including financial, for the child." The institution of these juvenile proceedings, some 7 years after the adoption took place, clearly "disrupted" their family relationship. It did not disrupt the adoption or the legal relationship created by it.

Nevertheless, our mission is to determine by a de novo review whether an abuse of discretion occurred. There is nothing to refute the lower court's implicit finding that Crystal's placement at GCH was necessitated by the same conditions that DSS agreed to pay the costs of treatment for and that the

charges at GCH were solely for such treatment. We are thus constrained to find that parental contribution under these circumstances was properly denied. We also note that the monthly subsidy payment to Kevin and Letta from DSS of $209 has ceased. We construe the comment in the juvenile court's order that it was refusing to make any finding regarding Kevin and Letta's ability to pay to mean nothing more than that such finding was unnecessary given the implicit finding that DSS' obligation under the subsidized adoption agreement was an "other source" which fully funded Crystal's care at GCH.

AFFIRMED.